## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DOMENICA A. HALL,                          :

     Plaintiff,                        :          Case No.  3:03CV207

vs.                                        :          District Judge Thomas M. Rose
                                                      Magistrate Judge Sharon L. Ovington
JAMES D. ROCHE, Secretary,                 :
Department of the United States
Air Force,                                 :

     Defendant.                        :

---

## REPORT AND RECOMMENDATIONS[1]

---

### I.      INTRODUCTION

From June 1986 through January 3, 2001, Plaintiff Domenica A. Hall was a civilian

employee of the United States Air Force at Wright Patterson Air Force Base near Dayton, Ohio.

She originally brought the present case *pro se* claiming that her supervisor, chief deputy trial

attorney Richard L. Hanson, sexually harassed her and committed other acts of sexual

discrimination against her during her employment with the Air Force.  Hall has since obtained

representation by an attorney, who has filed a Third Amended Complaint.  Hall's Third

Amended Complaint raises claims under Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §2000e, *et seq.*, and characterizes her claims as follows: Count I – Sexual Harassment;

Count II – Sexual Discrimination; Count III – Hostile Work Environment; Count IV –

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

Obstruction of Investigation Reprisal; and Count V – Constructive Discharge.  (Doc. #26).

This case is before the Court upon Defendant Secretary of the Department of the Air Force's ("the Air Force's") Motion for Summary Judgment (Doc. #76), Hall's Memorandum in Opposition (Doc. #77), the Air Force's Reply (Doc. #78), and the record as a whole.

## II.    FACTUAL BACKGROUND

### A.    <u>Introduction</u>

Hall alleges that her supervisor, Hanson, subjected her to a sexually hostile work environment and discriminated against her on the basis of sex by engaging in the following: leering at her; calling her a "bitch"; mishandling an anonymous letter about her; talking softly to her; abusing her work hours; and interfering with her ability to obtain promotions.  Accepting Hall's deposition testimony and other evidence as true reveals the following.

### B.    <u>Unwanted Leering and Chili Cookoff</u>

In late 1994 or early 1995 Hall encountered Hanson at a copier machine.  Hall alleges that Hanson stared at her pelvis.  Hall testified during her deposition, "It was extremely uncomfortable, extremely uncomfortable."  (Doc. #71, Hall's deposition at 12).  She was about five feet from him.  She did not report this incident to anyone.  *Id*. at 12-14.

In February 1996 Hanson asked Hall if she was bringing a dish to an office chili cookoff.  Hall informed Hanson that she really did not know if she would bring a dish.  *Id*. at 16.  Upon learning this, Hanson replied, "Well, whatever you're bringing, why don't you just go ahead and bring it and then I'll pay for it.  We'll split the cost."  *Id*.  Hall "was just very taken aback by that because that was not something normal for him to do."  *Id*.  Hall did not attend the chili cookoff.

2

She later learned that during the chili cookoff, Hanson had commented that the dish was Hanson and Hall's contribution.  *Id*. at 19-20.  Hall "just didn't particularly care for that connotation of it being our contribution."  *Id*. at 20.

Mark Landers, a civilian attorney who worked at JAB[2] and knew both Hall and Hanson, testified during his deposition that Hanson "repeatedly tried to tell people ... that nobody liked Domenica Hall....  He had a dislike for her...."  (Doc. #62, Landers' depos. at 46).  Landers further testified, "he [Hanson] told me that he didn't like her.  He said she was a bitch, a troublemaker."  *Id*.; *see also id*. at 109, 114.  On another occasion, Hanson similarly stated to Landers, "She's just a bitch."  *Id*. at 123.

In May 1997 Hall and her son attended an office golf outing.  After the golf ended, there was some socializing attended by Hanson.  (Doc. #71, Hall's depos. at 82-84).  During this socializing, according to Hall, "Hanson was sitting there and he just kept staring."  *Id*. at 84.  The next week, Hall "happened to run into Hanson in the back hall [at work]..., he was getting something from the copier and he just ... and ... he just looked at [Hall] and he was so evil, so cold, it just scared me."  *Id*. at 84.

Somewhere around this time, Hall moved her office into Building 30 away from the building where Hanson's office was located.  *Id*. at 84-85.  She explains, "The decision had not been made to actually set up an office in Building 30, but after that last run-in with Hanson, I just kind of moved myself up to Building 30 and tried to have as little contact with JAB as possible so that they finally did set up an office up there."  *Id*. at 85.  At times, however, Hall had

---

[2]  The Air Force explains, "JAB is the office symbol for a group of attorneys (both Air Force officers and civilians) and support personnel who are charged with handling the litigation of government contract matters....  The head of the office is a full colonel in the Air Force Judge Advocate General Corp., the principal deputy is a GS-15 civilian, who at all relevant times was Mr. Richard Hanson."  (Doc. #76 at 1 n.1).

to visit and work in Building 11, where Hanson worked.  She testified:

> I did have to come down to Building 11 on occasion to man the
> telephones.  It was part of the administrative duties, and I would come down with
> great trepidation and do my time and then go back up.  I know there was one time
> further on in '97 when I did have to go down and see Hanson and it was just him
> and I in his office and I really do not remember what it was for, but I did have to
> go down and at that point in time he did, he did stand there and just leer at my
> breasts and it was so demoralizing.

*Id.* at 85-86.  No one else was present in Hanson's office during this incident.  Hanson did not

touch Hall or say anything of a sexual nature.  *Id.* at 86.  Hall's attorney acknowledged during

her deposition that Hanson never touched Hall.  *Id.* at 102.

Mark Landers testified during his deposition that he saw Hanson repeatedly leer at Hall's

breasts "eight to ten times in that 1995, 1996 timeframe...."  (Doc. #62, Landers' depos. at 75-76,

80).  Landers alleges that Hanson subjected Hall and other women "to an environment where

Hanson's perverted conduct is always looking at them, leering around, coming around, making

them feel uncomfortable, which was the consistent thing...."  *Id.* at 75.

### C.    <u>Anonymous Letter</u>

In 1996 Colonel Hoover, then chief trial attorney at JAB, received an anonymous letter

accusing Hall of "sweet talking her way out of doing work...," sleeping in offices of attorneys

who were not in the building that day, and reading and doing needlepoint while at her desk.

(Doc. #70, Hall's depos. at 136-38; Doc. #71, Hall's depos. at 23-24).

Hanson informed Hall that she was the subject of the anonymous letter.  (Doc. #71,

Hall's depos. at 23-24).  Hall had no idea who wrote the anonymous letter, and she never found

out who wrote it.  *Id.* at 29; Doc. #70, Hall's depos. at 137-38.

Hanson showed Hall the anonymous letter, and after she read it, Hanson asked her

questions about it.  Hall explained that she did read books, do needlepoint, and take brief naps, but only during her lunch breaks.  (Doc. #71, Hall's depos. at 23-25).  Hanson instructed Hall to write her responses to the anonymous letter and give them to him so he could put them in her personnel (the so-called "971") file.  *Id*. at 23-25, 28.  Hall believes that she originally agreed to do so, then later changed her mind, telling Hanson in a memo that she did not have to respond to an anonymous letter.  *Id*. at 28.  Along with her memo, Hall gave Hanson "letters of endorsement from various attorneys within the office in reference to [her] work performance."  *Id*.

### D.    Talking Softly and Accusations about Work Hours

Hall alleges that in October or November 1995, on a day when she was working for the chief trial attorney, Hanson approached her and started talking very softly to her.  She described his demeanor as "very strange."  (Doc. #71, Hall's depos. at 9).  She "just let him talk and he eventually walked away...."  *Id*. at 10.  Hall does not remember what Hanson said; it was the tone of his voice and his demeanor that made her "extremely uncomfortable."  *Id*. at 10.

In June 1996 Hall was again working for the chief trial attorney.  She had obtained permission to leave work at 3:00 p.m. instead of 5:00 p.m..  *Id*. at 31-32.  However, instead of leaving work at 3:00 p.m., she left at 2:30 p.m.  She worked through her lunch hour so she could leave one-half hour earlier than her leave slip authorized.  *Id*. at 32.

Despite this authorization, Hanson chastised Hall for leaving early.  *Id*. at 33.  Hall testified, "his voice was raised, I thought considerably raised...."  *Id*.  Hanson had previously spoken with Hall about using her lunch times to go to the gym.  Hall informed Hanson that she "was not there any longer than anybody else that's there."  *Id*. at 34.  Hanson responded that Hall needed to make sure that it was within her allotted lunchtime.  *Id*.

5

### E.    Promotions and Training

Hall challenges the restructuring of the position of secretary for the chief trial attorney so that it became a legal technician position. Robin Colvell, the chief trial attorney's secretary, informed Hall that the position had been promised to her (Colvell). (Doc. #70, Hall's depos. at 117).

In the fall of 1996 Hall applied for a paralegal position. She learned from Colvell that she (Colvell) had been promised this position. *Id*. at 54. Four individuals were interviewed for this position. In a list that ranked the applicants for this position, Hall and Colvell were ranked second. Jane Harshberger, who was ranked ninth, was selected for the position. *Id*. at 54, 121-22.

Hall's claims in the present case are based in part on her unsuccessful attempts to add an SF-612 form to her personnel file. When signed by a supervisor, an SF-612 form demonstrates performance of work above the normal job requirements. By seeking to add this form to her personnel file, Hall was attempting to document that she had actually performed the work of a paralegal for more than one year. Hall maintains that both Hanson and the chief trial attorney with JAB thwarted her effort to document in her personnel file her ability to perform paralegal work.

Hall alleges that Hanson refused to sign off on an SF-612 and that he attempted to keep her from qualifying for a paralegal position. (Doc. #70, Hall's depos. at 104, 117). According to Hall, Colvell told her that management did not like Hall and that she might as well not apply for the position. *Id*. at 117.

Hall also requested a desk audit to determine whether her job duties were properly

classified as a GS-6 or GS-7. (Doc. #71, Hall depos. at 90-91). The individual performing the

desk audit informed Hall that she could not audit the position for GS-7 status because the written

job description described her job as a GS-6 position. *Id.* at 91-92. The chief trial attorney

informed Hall that although he had twice submitted her position, he could not "get it rated out

higher than a [GS-]6." *Id.* Hall was thus thwarted in her effort to improve her candidacy for

promotion by obtaining documentation of her paralegal skills.

### III.    SUMMARY JUDGMENT STANDARDS

A moving party is entitled to summary judgment in its favor if there is no genuine issue

as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby,*

*Inc.* 477 U.S. 242, 247 (1986). To determine if a genuine issue of material fact exists, the Court

evaluates the evidence and inferences drawn therefrom in the light most favorable to the

nonmoving party. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587

(1986); *see Little Caesar Enterprises, Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The Court's function is not to weigh the evidence to determine the truth of the matters asserted

but to determine if there is a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 249.

"The burden placed upon the movant for summary judgment is to show that the non-

moving party has failed to establish an essential element of his case upon which he would bear

the ultimate burden at trial." *Guarino v. Brookfield Tp. Trustees,* 980 F.2d 399, 403 (6th Cir.

1992); *see Hager v. Pike County Bd. of Education*, 286 F.3d 366, 370 (6th Cir. 2002). If the

movant makes this showing, the nonmoving party may not rely on the bare allegations of the

Complaint but must present affirmative or "significant probative evidence..." in support of his or

her claims.  *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002); *see Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994); *see also Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992).  The purpose driving this requirement is that summary judgment is designed to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Lenz v. Erdmann Corp*., 773 F.2d 62, 66 (6th Cir. 1985)(citation omitted); *see Matsushita*, 475 U.S. at 587.

The Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Guarino,* 980 F.2d at 404; *see InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  Rather, the burden falls squarely on the nonmoving party to designate specific facts or evidence in dispute.  *See Anderson*, 477 U.S. at 250; *see also Adams*, 31 F.3d at 379; *Guarino*, 980 F.2d at 404-05; *Street*, 886 F.2d at 1479-80.

Ultimately, the Court must determine at the summary-judgment stage whether the evidence presents a sufficient disagreement to require submission of the challenged claim or claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law.  *Anderson*, 477 U.S. at 251-52; *see Little Caesar Enterprises*, 219 F.3d at 551.

## IV.    DISCUSSION

### A.    Sexual Harassment, Sex Discrimination, and Hostile Work Environment

#### 1.
#### The Parties' Contentions

The Air Force contends that it is entitled to summary judgment because Hall has not created a genuine issue of material fact concerning her claims of sexual harassment, sex discrimination, and hostile work environment.  The Air Force explains that Hall has not alleged facts, or created a genuine issue of material fact, sufficient to satisfy the objective test applicable to Title VII claims of sexually hostile work environment under *Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004) and other applicable Sixth Circuit caselaw.

Hall's Statement of Material Facts quotes extensively from her pleadings.  (Doc. #77 at 2-6).  Hall contends, "Defendant..., purposefully, ignores the corroborating deposition testimony of Mark Landers, Marie Mee, Ruth Cairo, Sam Hilker, and other testimony by Plaintiff."  *Id.* at 7.  Hall argues, "Plaintiff and Mr. Landers have testified that Plaintiffe [sic] was referred to as a 'bitch.'  She also identifies specifically how her treatment differed from that of other male coworkers.  Specifically, there is no evidence that male workers were referred to in this highly derrogatory [sic] manner.  Nor, were any males leered at as to their chest or crotch."  *Id.* at 10. Hall emphasizes, "Plaintiff maintains that the sexually explicit and demeaning conduct and the unmitigated manner it was carried out constitutes sexual harassment as alleged in the Complaint and as discussed in the previous section [of her Memorandum in Opposition], and such incidents demonstrate that Defendant's knowledge of the conduct and failure to stop was sufficiently severe <u>or</u> pervasive to give rise to a violation of Title VII."  *Id.* at 11 (Hall's emphasis).

#### 2.

9

## Hostile Work Environment Sexual Harassment

Title VII prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII only prohibits workplace harassment when it occurs because of an employee's sex and when it affects a term, condition, or privilege of his or her employment. *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 80 (1998); *see Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64-66 (1986); *see also Black v. Zaring Homes, Inc*., 104 F.3d 822, 825 (6th Cir. 1997).

While Title VII "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in the workplace...," *Meritor Savings Bank*, 477 U.S. at 64, it does not prohibit all disagreeable, undignified, or obnoxious workplace behavior, even when such behavior occurs because of an employee's sex or has sexual overtones, *Black*, 104 F.3d at 825. "[T]he *Meritor* standard 'takes the middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.'" *Williams v. General Motors Corp*., 187 F.3d 553, 560 (6th Cir. 1999)(quoting in part *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993)). Thus, allegations of sexual harassment are sufficient to violate Title VII only when – considering the totality of the circumstances – a "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment...." *Williams*, 187 F.3d at 560 (quoting in part *Harris*, 510 U.S. at 21).

Allegations of workplace sexual harassment must satisfy both an objective and a subjective standard to demonstrate a violation of Title VII. *Williams*, 187 F.3d at 566. "The

10

conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black*, 104 F.3d at 825 (citing *Harris*, 510 U.S. at 21-22).

Determining whether a reasonable person would find a particular work environment hostile or abusive begins with understanding the type of conduct not prohibited by Title VII.

> Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex....' [S]imple teasing'... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.
>
> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace such as sporadic use of abusive language, gender-related jokes, and occasional teasing....' [C]onduct must be extreme to amount to a change in the terms and conditions of employment.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(quoting in part *Oncale*, 523 U.S. at 81-82)(other citation omitted). In contrast, abusive language, gender-related jokes, occasional teasing, and their nastier ilk may occur with such severity and frequency that the cumulative effect is to create a work environment sufficiently hostile or abusive to violate Title VII. *E.g., Williams*, 187 F.3d at 563-64; *Moore v. Kuka Welding Systems*, 171 F.3d 1073, 1079 (6th Cir. 1999). "[V]erbal conduct alone can be the basis of a successful hostile work environment claim." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998)(quoting *Black*, 104 F.3d at 826).

Similarly, "[a] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile environment claim, even though no single

episode crosses the Title VII threshold." *Williams*, 187 F.3d at 564.  Central factors in this analysis are "the frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening or humiliating, or a mere offensive utterance...."[3]  *Black*, 104 F.3d at 826 (citation omitted).  No single factor is required and any other relevant factor may be considered. *Harris*, 510 U.S. at 23.

### 3.
### Analysis

Counts I, II, and III of Hall's Third Amended Complaint rest on a common core of alleged facts concerning Hanson's misconduct and abuse.  At this stage of the litigation, the Court accepts Hall's factual allegations and corroborating evidence as true and construes them in her favor.  *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 747 (1998); *see also Matsushita*, 475 U.S. at 587; *see also Little Caesar*, 219 F.3d at 551.  Despite this, however, no jury could reasonably conclude that Hanson's conduct was severe or pervasive enough to cause a reasonable woman in Hall's position to experience her work environment as sexually hostile or abusive.  *See Black*, 104 F.3d at 825.  Hall has simply not pierced her pleadings by pointing to affirmative or significant probative evidence upon which a jury could reasonably conclude that she was subjected to a sexually hostile work environment in violation of Title VII.  *See id*.; *see also Chao*, 285 F.3d at 424; *Lenz*, 773 F.2d at 66.

Beginning with the incidents of unwanted leering, Hall and Landers at most allege that Hanson leered at Hall eight to ten times during 1995 to 1996.  *Supra*, §II(B).  When considered under the applicable factors, this leering fails to satisfy the objective test for hostile work

---

[3] *Black* states a fourth factor, "whether it unreasonably interferes with an employee's performance...," 104 F.3d at 826, which is properly considered as part of the subjective test.  *Williams*, 187 F.3d at 566-67.

environment sexual harassment.  First, the incidents of unwanted leering, although numerous, were not frequent when considering they occurred over a two-year period.  Ten incidents over a period of roughly fifty to one-hundred workweeks shows relatively infrequent occurrences. Second, this conduct was not severe and was not physically threatening to Hall.  Hall did not testify that she felt physically threatened during these incidents; she instead described the incidents as "extremely uncomfortable, extremely uncomfortable."  (Doc. #71, Hall's depos. at 12).  This type of unwanted leering is not the type of severe or pervasive misconduct that a reasonable person would find hostile or abusive.  Instead, it is more akin to isolated, or at most relatively few, offensive workplace comments, which fail to demonstrate the presence of a sexually hostile work environment in violation of Title VII.  *See Black*, 104 F.3d at 826.

Hall also alleges that Hanson talked softly to her and that he described her as a "bitch" to Landers.  Hall described an incident in late 1995 when Hanson started softly talking to her.  His demeanor was "very strange."  *Supra*, §II(D).  Although odd, Hanson's act of softly talking to Hall did not constitute severe or pervasive conduct that a reasonable person would find hostile or abusive.  Similarly, Landers testified about only two incidents when Hanson called Hall a "bitch." *Supra*, §II(B).  This conduct was not severe or pervasive because Hall has not pointed to evidence in the record indicating that Hanson ever called her a "bitch" in her presence and because this name-calling occurred infrequently during her many years of employment under Hanson's supervision.  Although such name-calling is unwarranted in any workplace situation and is a telltale sign of the poorest management skills as well as a complete absence of professionalism, no jury could reasonably find that Hanson's infrequent name-calling outside Hall's presence constituted severe conduct that a reasonable person would find hostile or

13

abusive.

Hall also points to incidents of harassment that are not tinged by sexual overtones.  To constitute sexual harassment in violation of Title VII, "the conduct underlying a sexual harassment claim need not be overtly sexual in nature.  *Any* unequal treatment of an employee *that would not occur but for the employee's gender may*, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile work environment in violation of Title VII."  *Williams*, 187 F.3d at 565 (emphasis in *Williams*).  It must therefore be determined whether Hall's allegations involving not-overtly-sexual conduct were sufficiently severe or pervasive to violate Title VII.  *See id.*  These include many allegations, discussed in detail above, *supra*, §II, concerning Hanson's conduct at the chili cookoff; his mishandling of the anonymous letter, his act of telling people that nobody liked Hall and that he did not like Hall; his accusations concerning her work hours; and his opposition to her applications for promotion.  Assuming Hanson engaged in this conduct, Hall has not raised sufficient allegations to demonstrate that Hanson's behavior was sufficiently severe or pervasive to violate Title VII.  Indeed, although Hanson doubtlessly made Hall's work life more difficult by engaging in this not-overtly-sexual conduct, when viewed together with Hall's other allegations of sexual harassment, no jury could reasonably conclude that Hanson created a sexual hostile work environment in violation of Title VII.  This conclusion is bolstered by *Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004), and the cases cited therein, upon which the Air Force correctly relies.

In *Valentine-Johnson* the United States Court of Appeals rejected a sexual-harassment claim at the summary-judgment stage, because the plaintiff failed to present evidence showing that her work environment was objectively offensive.  386 F.3d at 814.  The plaintiff in

14

*Valentine-Johnson* alleged one incident when her supervisor put his arm around her, another incident when he stood too close to her, other incidents that created a sexually charged work atmosphere involving inappropriate behavior between her supervisor and other women in the office, and the plaintiff's belief that her supervisor's comment that he would "take care of her" if she was "nice to him" referred to sex. 386 F.3d at 814. The Court of Appeals concluded that this conduct was not sufficiently severe or pervasive to violate Title VII. *Id*. As in *Valentine-Johnson*, Hall's allegations do not involve any physically threatening conduct, and her allegations of name-calling, unwanted leering, and other misconduct when considered together in light of the totality of the circumstances do not reveal misconduct of a severe nature that occurred with such frequency that a reasonable woman would find hostile or abusive.

In addition, the Court of Appeals in *Valentine-Johnson* rejected the plaintiff's sexual-harassment claim based on Sixth Circuit cases that rejected more serious allegations of sexual-harassing misconduct. *Id*. (citing and parenthetically discussing *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000); *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000); *Black*, 104 F.3d at 826). Hall's allegations similarly fail this comparative measure of severe or pervasive conduct. In *Morris* the Court of Appeals rejected a Title VII sexual-harassment claim even though the employer allegedly requested sexual favors from the employee in exchange for a better evaluation, allegedly called the plaintiff "Hot Lips," allegedly made comments about the plaintiff's state of dress, and allegedly told dirty jokes in front of the employee. 201 F.3d at 790. The Court of Appeals held in *Burnett* that a supervisor's act of placing a cigarettes under a female employee's bra strap, his remark that she had "lost her cherry," and his comment that he was aroused by the phrase "dick the mall" was not sufficiently

severe or pervasive to create a sexually hostile work environment.  203 F.3d at 985.  The Court

of Appeals in *Black* rejected a sexual-harassment claim based on allegations that a supervisor

teased the plaintiff about dancing on tables at a local strip bar, joking about "Hootersville" or

"Titsville," calling the plaintiff a "broad," and teasing the plaintiff's pronunciation of the word

"bosom."  104 F.3d at 826.  Accepting all of Hall's allegations as true and viewing them under

the totality of the circumstances reveals less serious allegations than were at issue in *Morris*,

*Burnett*, and *Black*.  Hall has therefore failed to allege facts or rely upon evidence upon which a

jury could conclude that Hanson engaged in severe or pervasive conduct that a reasonable

woman in Hall's position would have found sexually hostile or abusive.

Comparing Hall's allegations to those at issue in *Williams v. General Motors Corp.*, 187

F.3d 553 (6th Cir. 1999) is likewise instructive.  *Williams* is a sexual-harassment case in which

the plaintiff's Title VII claim survived a Motion for Summary Judgment because the plaintiff

presented evidence of sufficiently severe or pervasive sexual harassment.  The plaintiff alleged

that her supervisor targeted her with unwanted and humiliating sexual innuendo on several

occasions.  On one occasion, the supervisor, looked at the plaintiff's breasts and said, "You can

rub up against me anytime," adding, "You would kill me, Marilyn.  I don't know if I can handle

it, but I'd die with a smile on my face."  187 F.3d at 563.  Another time, "he put his arm around

her neck and placed his face against hers, and noticing that she had written 'Hancock Furniture

Company' on a piece of paper, said, 'You left the dick out of the hand.'"  *Id*.  On a third occasion,

while she was bending over, the supervisor "came behind her and said, 'Back up; just back up.'"

*Id*.  The record also indicated that a co-worker said, "Hey, slut," and that plaintiff heard, "I'm

sick of these f**cking women" when she was the target of a thrown box.  *Id*.  The plaintiff was

also the victim of more than mere oafish behavior when she found office supplies glued to her desk, when she was locked in her work area, and when she was hit by a thrown box.  *Id*. Viewing these allegations together in the totality of the circumstances, the Court of Appeals found that the plaintiff's co-workers and supervisor engaged in conduct sufficient to create a sexual hostile work environment.[4]  187 F.3d at 563-64.

Hall's allegations are simply not analogous to the *Williams* level of severity or pervasiveness.  This is not to conclude that *Williams* sets the bar for the minimum that must be shown to establish severe or pervasive conduct.  *Williams* instead merely provides an example of an evidentiary record sufficient to create genuine issues of fact regarding severity and pervasiveness.  *See id*.  Title VII's objective test for what constitutes severe and pervasive conduct may be satisfied by a quantity and/or quality of evidence somewhere between *Williams*, on the one hand, and  *Morris*, *Burnett*, and *Black* on the other.  Regardless of where the exact point of sufficient proof is, Hall's allegations and evidence fall short of the conduct in *Morris*, *Burnett*, and *Black* and fall well short of the severe or pervasive conduct in *Williams*.

Accordingly, to the extent Counts I, II, and III of Hall's Third Amended Complaint are based on the presence of a hostile work environment sexual harassment in violation of Title VII, the Air Force is entitled to summary judgment.

**B.**     **Sex Discrimination**

**1.**

---

[4]  Interestingly, following a two-day trial on remand, a jury rejected Williams' sexual harassment claim, and the Sixth Circuit later affirmed.  *Williams v. General Motors Corp*., 18 Fed. Appx. 341 (6th Cir. 2001).  Although interesting, this jury verdict and result on appeal have no impact on the instant case.

**The Parties' Contentions**

Hall claims that the Air Force discriminated against her on the basis of her sex in violation of Title VII.  In addition to her allegations of sexual harassment, upon which this claim partly rests, *see* Doc. #26 at ¶¶ 34-35, Hall's Third Amended Complaint states, "Hanson acted against Plaintiff because of her sex and to deprive her of her rights, such as the conditions and terms of Plaintiff's employment." *Id*. at ¶34.

The Air Force contends that it is entitled to summary judgment on this claim because Hall cannot demonstrate a *prima facie* case of sex discrimination and because Hall has not shown pretext in the Air Force's proferred reason for denying her promotions – she was not the best qualified applicant.

Hall contends that she "has established a prima facie case of discrimination by presenting direct evidence of intentional discrimination by Mr. Hanson..., and by showing the existence of circumstantial evidence which creates an inference of discrimination."  (Doc. #77 at 12).  These conclusory assertions fail to meet Hall's burden at the summary-judgment stage.  Because the Air Force's Motion for Summary Judgment points to a lack of evidence supporting Hall's *prima facie* case, she may not rely on the mere allegations of her Complaint; she must point to affirmative or significantly probative evidence in the record to support her *prima facie* case.  *See Chao*, 285 F.3d at 424; *see also Adams*, 31 F.3d at 379; *Mitchell*, 964 F.2d at 582.  The Court, moreover, does not have the duty to search the entire record for evidence sufficient to create a genuine issue of material fact.  The burden to do so falls on Hall, the nonmoving party.  *See Guarino*, 980 F.2d at 404; *see also InterRoyal Corp*., 889 F.2d at 111; *Street*, 886 F.2d at 1479-80.  Having argued in only a conclusory manner, *see* Doc. #77 at 12, Hall has not met her

18

burden.

In addition, Hall has not presented direct evidence of discrimination and she misperceives the distinction between direct evidence, which by itself is sufficient to establish intentional sex discrimination in violation of Title VII, and circumstantial evidence, which must be evaluated under the analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

## 2.
## Direct Evidence

 "Direct evidence of discrimination, if credited by the factfinder, removes the case from *McDonnell Douglas* paradigm because the plaintiff no longer needs the inference of discrimination that arises from the prima facie case." *Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111, 115 (6th Cir. 1987).  Simply put, direct evidence means direct proof of discrimination.  A hypothetical example of direct evidence of intentional discrimination would certainly exist if an employer informed its employee, "You are fired because of you are a woman."  *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).

Although direct-evidence cases are rare, they do exist.  In *Wells v. Cherokee Corp.*, 58 F.3d 233 (6th Cir. 1995), for example, the plaintiff presented direct evidence that her supervisor told her she was "too old to do the job" and that a "younger person could do more than" she could.  *Id*. at 237; *see Williams v. United Dairy Farmers*, 20 F.Supp.2d 1193 (S.D. Ohio 1998).

Assuming Hall's allegations about Hanson's conduct are true, a factfinder would need to infer from his conduct that he intended to discriminate against Hall because she is a woman.  This, therefore, is circumstantial not direct evidence.  *See Terbovitz*, 825 F.2d at 115 .  Hall, moreover, has not pointed to direct evidence showing that the Air Force denied her applications

19

for promotion because she is a woman or otherwise based a decision about the terms and conditions of her employment on her gender.  *See* Doc. #77 at 2-12.

Accordingly, Hall's contentions regarding direct evidence lack merit.  She must therefore proceed in support of her sex discrimination claim by the *McDonnell Douglas* circumstantial evidence method of proof.

### 3.
### Circumstantial Evidence

To support a circumstantial case of sex discrimination, Hall bears the initial burden to produce evidence of a *prima facie* case of intentional discrimination.  *See McDonnell Douglas*, 411 U.S. at 802.  To do so, she must produce evidence indicating that (1) she is a member of a statutorily protected class; (2) she experienced an adverse employment action; (3) she was qualified for the job she held or sought; and (4) "similarly situated non-protected employees were treated more favorably."  *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

The record contains no genuine dispute regarding elements one, two, and three of Hall's *prima facie* case: (1) she is female, a class protected by Title VII; (2) the Air Force's decisions to promote applicants other than Hall constituted adverse employment actions; and (3) she was qualified for the promotions she sought.  Hall, however, has not pointed to a similarly situated male employee at JAB who obtained a promotion instead of Hall or who the Air Force otherwise treated more favorably than Hall.  *See* Doc. #77 at 2-12.

Even if Hall had presented sufficient evidence to establish a *prima facie* case of sex discrimination, she has not responded to the Air Force's legitimate non-discriminatory reason – she was not the best-qualified applicant – for denying her applications for promotion.  *See* Doc.

#77 at 2-12.  Because the Air Force has articulated a legitimate, nondiscriminatory reason for its employment decisions, "the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity...," wherein the plaintiff has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for unlawful discrimination."  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

To establish the existence of a genuine issue of fact regarding pretext, Hall must produce affirmative or significantly probative evidence, *see Chao*, 285 F.3d at 424, that: (1) the Air Force's asserted reasons had no basis in fact, (2) the Air Force's asserted reasons did not actually motivate the employment decisions at issues, or (3) these reasons were insufficient to motivate the employment decisions at issue.  *See Manzer v. Diamond Shamrock Chemicals Co*., 29 F.3d 1078, 1084 (6th Cir. 1994).  Hall has neither referred to evidence of pretext nor offered argument demonstrating that the Air Force's reason constitutes a pretext for intentional discrimination.  *See* Doc. #77 at 12.  She has therefore met her burden at this stage of the case to show a genuine issue of material fact regarding pretext.

Accordingly, for all the above reasons, the Air Force is entitled to summary judgment on Hall's claim of sex discrimination.

### C.     Count IV – "Obstruction of Justice Reprisal"

#### 1.
#### Background

Count IV of Hall's Third Amended Complaint is titled, "Obstruction of Justice Reprisal".

(Doc. #26 at 7).  Hall's pleading cryptically states in support, "Defendant's agents systematically obstructed the investigation of this matter as a reprisal against her for filing the complaint."  *Id*.

The Air Force contends that it is entitled to summary judgment on Count IV of Hall's Third Amended Complaint because United States District Judge Walter Herbert Rice held in *Horn v. Cohen*, 3:97cv00550 (Doc. #76, Exhibit A), that there is no private right of action, and hence no right of action by a government employee, against the EEO for failing to process a charge of discrimination.  (Doc. #76 at 24).  This contention misses the mark by overlooking that Hall seeks to raise a Title VII retaliation claim.  Although her Third Amended Complaint is not clear on this theory, Hall's response to the Air Force's Motion for Summary Judgment clarifies that she seeks to raise a Title VII retaliation claim based on the Air Force's conduct after she filed an EEO discrimination charge.  She explains:

> Plaintiff alleges in her Complaint that she was retaliated against in violation of Title VII after filing a charge of discrimination with the EEO office. The retaliation included being subjected to continued supervision by Mr. Hanson who was referring to her as a 'bitch' and 'troublemaker' and leering at her breast and crotch.  This can only be disregarded as not severe and pervasive if one is deaf, dumb, and foolish.  After the EEOC charge filing, Plaintiff should have been at least temporarily removed from Hanson's supervision while Defendant was investigating the matter.

(Doc. #77 at 13).

**2.**
**Hall's Retaliation Claim and Applicable Standards**

Title VII, 42 U.S.C. §2000e-3(a), "prohibits an employer from retaliating against an employee who has 'opposed' any practice by the employer made unlawful under Title VII." *Johnson v. University of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).  The *McDonnell Douglas* burden-shifting analysis applies to Hall's Title VII retaliation claim.  *See Johnson*, 215 F.3d at 578; *see also Morris*, 201 F.3d at 792-93.  Hall must first present affirmative evidence supporting a *prima facie* case of retaliation.  *See Morris*, 201 F.3d at 792-93.  If she succeeds, then the Air Force must articulate a legitimate non-retaliatory reason for its actions.  *See id*. at 793.  In the face of this reason, Hall must present affirmative evidence of pretext or a cover-up of retaliation.  *See id*.

Hall has attempted to demonstrate the existence of a *prima facie* case of retaliation.  *See* Doc. #77 at 13-18.  Although the Air Force raises contrary arguments regarding these elements, it has not attempted to assert a legitimate, non-retaliatory reason in response to Hall's retaliation claim and has not argued that Hall cannot demonstrate pretext.  *See* Doc. #76 at 24; Doc. #78.  Absent such arguments, the Air Force has not, at this point in the case, demonstrated that it is entitled to judgment as a matter of law with regard to pretext.  *See Guarino,* 980 F.2d at 403 ("The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden at trial."); *see also Hager*, 286 F.3d at 370.  As a result, the Air Force's Motion for Summary Judgment and Hall's responsive arguments present a controversy limited to Hall's *prima facie* case of retaliation.

To support a *prima facie* case of retaliation under Title VII, Hall must produce

23

affirmative evidence indicating that: (1) She engaged in activity protected by Title VII; (2) the Air Force knew about her protected activity; (3) the Air Force thereafter took an adverse employment action against her or subjected her to severe or pervasive retaliatory harassment by a supervisor; and (4) a causal connection existed between her protected activity and the Air Force's adverse employment action.  *See Morris*, 201 F.3d at 792.

### 3.
### Protected Activity and The Air Force's Knowledge

Hall has satisfied the first element of her *prima facie* case by attaching to her Third Amended Complaint a copy of the Complaint of Discrimination she filed with the EEOC on November 17, 2000.  (Doc. #26, Exh. A).  Her act of filing this EEOC Complaint constituted both opposition to discrimination and participation in an EEOC proceedings, and thus constituted activity protected by Title VII.  *See Johnson*, 215 F.3d at 579-80, 582.

Hall contends that she meets the second element of her *prima facie* case – showing the Air Force's knowledge of her protected activity – because she alleges the following in her Complaint:

> [P]rior to filing the charge of discrimination with the EEO office, she informed [an] EEO Manager that the discrimination was ongoing for five (5) years but this was stricken from her complaint.  Finally, in her Complaint, and supported by Landers' affidavit, Plaintiff alleges that Defendant [Colonel] Purdue[5] acted in concert with Mr. Hanson's desire to harass Plaintiff by not allowing her removal from Mr. Hanson's supervision with the knowledge that Hanson disliked Plaintiff and was preventing her from being considered for advancement and[/]or job progression/promotion.  Thus, viewing the evidence in the light most favorable to Ms. Hall, she has satisfied the second element for a prima facie case of retaliation under Title VII.

---

[5]  Colonel Alexander Purdue held supervisory authority over Hanson.  *See* Doc. #77 at 2.  Colonel Purdue is not an individual defendant in this case. *See* Doc. #26.  Colonel Purdue's knowledge may be imputed to the Air Force due to his supervisory-level status.  *See Cavin v. Honda of America Mfg., Inc*. 346 F.3d 713, 726 n.8 (6th Cir. 2003); *see also Danis-Shook Joint Venture XXV v. Secretary of Labor*, 319 F.3d 805, 812 (6th Cir. 2003).

(Doc. #77 at 14-15).

Hall's reliance on her EEOC Complaint is proper at this stage of the case since this document constitutes affirmative evidence of the date on which she engaged in a protected activity – November 17, 2000.  Hall has therefore presented affirmative evidence sufficient to establish that the Air Force knew about her protected activity on November 17, 2000.  Hall also relies on her report of discrimination to an EEO Manager on November 8, 2000.  It appears from Hall's Third Amended Complaint that this occurred on November 8, 2000 when she "timely contacted the EEOC office about incidents of continuing sexual discrimination, sexual harassment, and a hostile work environment that had been continuing for five years during her employment with the ... Air Force."  (Doc. #26, ¶11).  Hall attached to her Third Amended Complaint a copy of a document dated November 8, 2000 charging the Air Force with discrimination.  *See id*. at Exh. A.  Accepting this document as authentic and its allegations as true, the Air Force first gained knowledge of Hall's protected activity on November 8, 2000.  *See id*.

Hall has not presented affirmative evidence upon which a jury could reasonably conclude that she engaged in a protected activity – and hence that the Air Force knew of such activity – before November 8, 2000.  Although Hall relies on Landers' affidavit, Landers does not identify any protected activity that occurred before November 8, 2000.  Landers states, "I am aware that Ms. Hall, before separating from employment, attempted to have herself removed from Mr. Hanson's supervision but her efforts were thwarted by Col. Purdue.  Additionally, I personally attempted to have Ms. Hall removed from under Mr. Hanson's [supervision] once he started referring to her as a 'bitch' and 'troublemaker' on several occasions during the 1995-1998

25

timeframe...."  (Doc. #77, Exh. B at ¶10).  These statements do not establish that Hall engaged in any protected activity before November 2000.  The only acts identified by Landers are both his efforts and Hall's attempts to get Hall transferred away from Hanson's supervision.  No jury could reasonably conclude, however, that these attempts to obtain a transfer constituted a protected activity.  Landers does not state in his affidavit that either he or Hall informed Colonel Purdue, or any of the Air Force's supervisory-level personnel, that Hall sought a transfer due to Hanson's harassing or discriminatory conduct.  Landers' reason for attempting to secure Hall's transfer was because Hanson had called Hall a "bitch" and a "troublemaker."  (Doc. #77, Exh. A at ¶10).  This allegation does not indicate that Landers informed Colonel Purdue, or any of the Air Force's supervisors, about Hanson's wholly inappropriate remarks or other misconduct when he attempted to obtain Hall's transfer.  Landers' affidavit when read in its entirety does not describe when he or Hall informed the Air Force about Hanson's alleged conduct.  Consequently, no jury could reasonably infer from Landers' affidavit that the Air Force knew about Hall's protected activity at any time before her report to the EEOC on November 8, 2000.

Accordingly, Hall has established that she engaged in a protected activity by reporting discrimination to the EEOC on November 8, 2000.  The evidence upon which Hall relies, *see* Doc. #77 at 14-15, establishes that the Air Force first learned about her protected activity on November 8, 2000.

## 4.
## Adverse Employment Action

Hall contends that she has met the third element of her *prima facie* case – materially

adverse changes in the terms and conditions of her employment – by allegations about Hanson's severe and pervasive sexual harassment and through her contention that the Air Force constructively terminated her employment.

Retaliatory harassment by a supervisor can be actionable under violate Title VII. *Morris*, 201 F.3d at 791. To support such a claim, Hall must satisfy the same objective severe-or-pervasive-conduct test that is applicable to sexually hostile work environment claims. *See Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003). Hall must therefore present affirmative evidence indicating that Hanson's harassment was "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive...." *Id.* (citation omitted). As discussed above, Hall has not presented such evidence. *Supra*, §IV(A)(3). Hall has therefore not demonstrated that Hanson's harassment or abuse constituted an adverse employment action. *See Akers*, 338 F.3d at 497-99.

As will be seen, Hall has not presented sufficient evidence to demonstrate that the Air Force constructively terminated her employment. *See infra*, §IV(D). Consequently, no jury could reasonably find that Hall's resignation constituted an adverse employment action.

Accordingly, Hall has not satisfied the third element of her *prima facie* case of retaliation.

## 5.
## Causal Connection

Hall contends that she satisfies the fourth element of her *prima facie* case – a causal link between her protected activity and the adverse employment action – based on the allegations of her Complaint. *See* Doc. #77 at 16-18. This fails to meet her burden at the summary judgment stage to go beyond the pleadings by producing significantly probative evidence in support of her

claim.  *See Chao*, 285 F.3d at 424; *see also Adams*, 31 F.3d at 379; *Mitchell*, 964 F.2d at 582.

In addition, because Hall has not established the occurrence of an adverse employment action, no

jury could rationally find a causal connection between this non-existent employment action and

the Air Force's knowledge of her protected activity.

Turning to timing issues, because the Air Force first learned about Hall's protected

activity on November 8, 2000, she must point to an adverse action after this time in order to

show a causal connection.  Because time runs forward and never backward, no jury could

reasonably find that the Air Force's knowledge on November 8, 2000 caused prior events – such

as Hanson's harassment or the denials of her promotions or transfers – to occur.  Consequently,

no jury could rationally infer a causal connection between the Air Force's knowledge on

November 8, 2000 and Hanson's prior harassment or the Air Force's decisions to deny Hall a

promotion or transfer.

Consequently, Hall has not demonstrated the fourth element of her *prima facie* case.

### 6.
### Conclusions

For the above reasons, Hall has not met her burden of pointing to significant probative

evidence in support of a *prima facie* case of retaliation.  The Air Force is consequently entitled to

summary judgment on Hall's retaliation claim.

### D.     Count V – Constructive Discharge

Hall claims that she "was constructively forced to retire early and take reduced retirement

benefits as a result of the allegations set forth in [her] complaint."  (Doc. #26 at 7).

The Air Force contends that it is entitled to summary judgment on this claim because

28

Hall cannot point to any other woman employee who felt compelled to leave her employment due to hostile or abusive conduct by Hanson or others at JAB.

Constructive discharge by itself is not an actionable claim; it instead is a potential starting point for measuring damages in Title VII cases when a plaintiff resigns due to discriminatory or retaliatory conduct.  "Through this legal construct, a plaintiff who is forced out by discriminatory conduct may bring a successful Title VII claim even though the plaintiff was never officially dismissed by the defendant." *Vitug v. Multistate Tax Comm'n*., 88 F.3d 506, 517 (7th Cir. 1996).  Constructive discharge occurs when an employer "deliberately creates intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

To demonstrate that she was constructively discharged, Hall must show that her working conditions were "so difficult or unpleasant that a reasonable person in ... [her] shoes would have felt compelled to resign.'" *Yates v. Avco Corp*., 819 F.2d 630, 636-37 (6th Cir. 1987)(quoting in part *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).  In the constructive discharge context, as when considering claims of hostile work environment sexual harassment, the Court considers the totality of the circumstances including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Goldmeier v. Allstate Insurance Co*., 337 F.3d 629, 635 (6th Cir. 2003)(quoting *Harris*, 510 U.S. at 23)(other citations omitted).  "The circumstances are examined from the point of view of a reasonable member of the protected class." *Id*. (citing *Yates*, 819 F.2d at 636-37).

As discussed above, Hall's allegations and other evidence about Hanson's misconduct simply fail to rise to the level of severe or pervasive sexual harassment or abuse.  *Supra*, §IV(A)(3).  Hall has therefore failed to meet her burden of creating a genuine issue of material fact concerning whether a reasonable woman in her work situation would have felt compelled to resign.  *See Goldmeier*, 337 F.3d at 635.

Accordingly, the Air Force is entitled to summary judgment on Hall's constructive discharge claim.

## IT IS THEREFORE RECOMMENDED THAT:

1.      Defendant's Motion for Summary Judgment (Doc. #76) be GRANTED;

2.      Plaintiff's Third Amended Complaint be DISMISSED with prejudice; and

3.      The case be terminated on the docket of this Court.


July 20, 2005

    s/ Sharon L. Ovington    
Sharon L. Ovington
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

31